**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| LUCIA IACOBONI,<br><br>        Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY<br>ADMINISTRATION,<br><br>        Defendant. | CASE NO. 1:21-CV-01235-AMK<br><br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br>**MEMORANDUM OPINION AND ORDER** |

Plaintiff Lucia Iacoboni ("Plaintiff" or "Ms. Iacoboni") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying her

application for Disability Insurance Benefits ("DIB").  (ECF Doc. 1.)  This matter is before this

Court by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  (ECF Doc. 14.)

For the reasons set forth below, the final decision of the Commissioner is **AFFIRMED**.

### I.      Procedural History

On March 29, 2019, Ms. Iacoboni filed an application for DIB.  (Tr. 170-71.)  She

alleged a disability onset date of January 1, 2017.  (Tr. 170.)  She alleged disability due to

chronic back pain, chronic neck and shoulder pain, numbness in arms and hands, degenerative

disks, scoliosis, arthritis, carpal tunnel, depression, anxiety, and sleep disorder.  (Tr. 63.)  Her

application was denied at the initial level (Tr. 93-96) and upon reconsideration (Tr. 101-07), and

she requested a hearing (Tr. 108).  On June 23, 2020, a hearing was held before an

Administrative Law Judge ("ALJ").  (Tr. 33-61.)

On July 28, 2020, the ALJ issued a decision finding that Ms. Iacoboni had not been under

a disability within the meaning of the Social Security Act from January 1, 2017 through August

28, 2019, but became disabled on August 29, 2019 and remained disabled through the date of the

ALJ's decision on July 28, 2020.  (Tr. 9-28.)  On April 29, 2021, the Appeals Council denied

Ms. Iacoboni's request for review, making the ALJ's decision the final decision of the

Commissioner.  (Tr. 1-6.)

On June 23, 2021, Ms. Iacoboni filed a Complaint challenging the portion of the

Commissioner's final decision that found her not disabled within the meaning of the Social

Security Act from January 1, 2017 through August 28, 2019.  (ECF Doc. 1.)  The parties have

completed briefing in the case.  (ECF Docs. 10, 12.)

## II.     Evidence

### A.     Personal, Educational, and Vocational Evidence

Ms. Iacoboni was born in 1964, and was an individual closely approaching advanced age

under Social Security Regulations prior to the established disability onset date.  (Tr. 27.)  She

turned fifty-five on August 29, 2019, and was an individual of advanced age on the established

disability onset date.  (Tr. 27, 62.)  She had at least a high school education.  (Tr. 41.)

### B.     Medical Evidence

The ALJ found Ms. Iacoboni disabled as of August 29, 2019, the day of her fifty-fifth

birthday.  (Tr. 24, 62.)  Ms. Iacoboni does not dispute this finding, and contests only the finding

that she was not disabled from January 1, 2017 through August 28, 2019.  (ECF Doc. 10, p. 10.)

She also limits her challenge to the decision relative to her physical impairments.  (*Id.*)  The

evidence summarized herein is accordingly focused on evidence pertaining to Ms. Iacoboni's physical impairments during the period from January 1, 2017 through August 28, 2019.

### 1.    Relevant Treatment History

In February and March 2017, Ms. Iacoboni sought treatment for persistent neck pain from Osteopathic Manipulative Clinic physician Jared Placeway, D.O.  (Tr. 396-97.)  On examination, she had normal strength throughout, intact sensation, and intact tandem gait.  (Tr. 399, 396.)  Dr. Placeway noted that an MRI of her cervical spine performed February 25, 2017 showed a large C4-C5 disc complex causing indentation of the cord, with a small rim of fluid behind the cord.  (Tr. 396.)  On March 29, 2017, she underwent a C4-C5 fusion and discectomy. (Tr. 379-80.)

On November 21, 2017, Ms. Iacoboni saw Timothy Moore, M.D., at MetroHealth Surgical Services.  (Tr. 353.)  She reported that her symptoms had worsened since her surgery, she lacked stamina, and she could only be on her feet fifteen to twenty minutes.  (*Id*.)  On examination, Dr. Moore noted she looked well, exhibited full strength, and was neurologically intact.  (*Id*.)  Dr. Moore ordered an MRI of her cervical spine.  (*Id*.)

Ms. Iacoboni returned to Dr. Moore on December 19, 2017 and reported "feeling terrible."  (Tr. 352.)  The MRI taken after her November appointment was "clean," showing she had no junctional disc herniations and the fixation of her fusion was good.  (*Id*.)  Dr. Moore indicated he could not explain her symptoms except that her fusion was not yet healed.  (*Id*.)  Dr. Moore advised her to seek treatment through physical medicine rehabilitation.  (*Id*.)

On the same day, Ms. Iacoboni saw Kermit Fox, M.D., Director of Outpatient and Ambulatory Medicine at the MetroHealth Department of Physical Medicine and Rehabilitation, for a follow-up regarding pain.  (Tr. 347.)  She described her pain as a five out of ten, and

reported grip weakness in her hands, and pain in her hands, feet, shoulders, and low back that worsened throughout the day.  (*Id*.)  On examination, she had normal and symmetrical muscle tone, strength, and reflexes, no atrophy, moderately decreased right lateral bending, minimal paraspinal spasm, tenderness in the mid thoracic to lower paraspinals, and decreased sensation over right C7.  (Tr. 350.)  Dr. Fox's impression was chronic pain with myofascial overlay, and he suspected that Ms. Iacoboni's complaints were linked to ongoing stenosis and irritation.  (Tr. 351.)  He recommended epidural steroids and referred her to rheumatology.  (*Id*.)

On January 10, 2018 Ms. Iacoboni received an epidural steroid injection at C5-C6, which she tolerated well.  (Tr. 343.)  Dr. Fox advised her to follow up within two weeks.  (*Id*.)

A visit to rheumatologist Maria Antonelli, M.D., on January 22, 2018, ruled out inflammatory arthritis or connective tissue disease.  (Tr. 342.)

On February 13, 2018, Ms. Iacoboni returned to Dr. Fox and reported continued neck pain following her epidural steroid injection.  (Tr. 334.)  She reported the injection was only effective for two days, and that she had pain in her neck, hands, shoulders, low back, and feet, and grip weakness in her hands.  (*Id*.)  She reported these symptoms were present before her March 2017 surgery, were briefly resolved after surgery, and were worse than pre-surgical symptoms by the time of the examination.  (*Id*.)  Examination results were unchanged from December 2017.  (Tr. 336.)  Dr. Fox's impression was mild to moderate scoliosis, narrowing of the disc spaces between L3-L4, secondary to degenerative disease and degenerative changes at L5 level, more on the right side.  (Tr. 337.)  Dr. Fox also diagnosed spondylosis and cervical disc displacement.  (*Id*.)  He recommended conservative treatment, including branch blocks, medication, and continued use of a TENS unit.  (Tr. 338.)  Branch blocks at the C3-C4, C4-C5, and C5-C6 facet joints were performed on March 14, 2018.  (Tr. 332-33.)

Dr. Moore saw Ms. Iacoboni on March 29, 2018 for a one year follow-up regarding the March 2017 fusion to her cervical spine.  (Tr. 331.)  Ms. Iacoboni reported she was "just as miserable after surgery [as] she was before."  (*Id*.)  On examination, she had normal range of motion and hyperactive but equal reflexes.  (*Id*.)  He advised her she could "work with Dr. Fox and try to alleviate her misery" or undergo a posterior cervical fusion at C4-C5.  (*Id*.)

On April 23, 2018, Dr. Moore performed a C4-C5 anterior cervical discectomy and fusion with an exploration of the previous C4-C5 fusion, which was determined not to have healed.  (Tr. 310-11.)  There were no complications.  (Tr. 311.)  Ms. Iacoboni was evaluated by physical and occupational therapy before discharge, and reported she was independent in her activities of daily living and self-care but had difficulty standing or walking for extended periods of time.  (Tr. 315-18.)  She was able to ambulate 150 feet without an assistive device but demonstrated decreased cadence and B step length.  (Tr. 316.)  She was deemed functionally appropriate for discharge, and no further therapy was recommended.  (Tr. 316, 318.)

On June 28, 2018, Ms. Iacoboni returned to Dr. Moore for follow up.  (Tr. 303-04.)  He noted she was healing appropriately, was neurologically intact, and showed no signs of infection.  (*Id*.)  She reported "doing pretty well until a week ago" when she "started having a lot of posterior neck misery."  (*Id*.)  Dr. Moore continued some of her pain medications, recommended heat, ice, and sleeping in a soft collar, and advised her to return in two months.  (*Id*.).

Ms. Iacoboni returned to Dr. Moore on August 30, 2018, reporting she felt exactly like she did before the two surgeries.  (Tr. 302-03.)  Dr. Moore explained he had no idea where Ms. Iacoboni's misery was coming from and that everything was stable.  (*Id*.)  She had full strength and normal range of motion on examination, and imaging showed "no issues."  (*Id*.)  Dr. Moore ordered an MRI to make sure the canal was clear.  (Tr. 303.)  A cervical MRI obtained on

September 19, 2018 was "clean," and Dr. Moore advised that there was nothing more he could do surgically.  (Tr. 302.)

On November 13, 2018, Ms. Iacoboni was treated by Dr. Ellen Rosenquist as a new patient at the Twinsburg Family Health and Surgery Center.  (Tr. 643.)  She reported her chief complaint was low back pain with occasional radiation into the lower extremities.  (Tr. 645.)  The pain began five years before, and included muscle spasms, cramping, occasional stabbing pain, and occasional numbness in her legs and knee.  (*Id*.)  She reported that her back pain worsened with walking, bending, and lifting, and improved with sitting in a recliner or a hot tub.  (*Id*.)  She had participated in physical therapy in the past but did not continue her home exercise program.  (*Id*.)  Flexaril and Cymbalta were not helping and she had stopped using her TENS unit after a therapist told her not to use it, even though it had helped in the past.  (Tr. 645-46.)  On examination, Ms. Iacoboni had tenderness over the lumbar spine pain, reproduced with flexion, limited range of motion in the low back, and diminished sensation in her left thigh and calf, but otherwise normal findings that included full upper and lower extremity strength and normal gait.  (Tr. 646.)  A recent x-ray showed mild to moderate scoliosis, narrowing between L3-L4, secondary degenerative disease, and degenerative changes.  (*Id*.)  Dr. Rosenquist noted Ms. Iacoboni was physically deconditioned and recommended aqua therapy and home exercises.  (Tr. 647.)  She continued the Flexeril prescription, advised Ms. Iacoboni to use her TENS unit, asked her to return in four to six weeks, and noted that diagnostic lumbar medial branch nerve blocks could be considered in the future.  (*Id*.)

A physical therapy assessment for aqua therapy was performed on November 21, 2018.  (Tr. 640.)  Goals included standing and walking for thirty minutes without pain or symptoms, sleeping through the night, normalizing her gait mechanics, and tolerating household activities

without pain or symptoms for one hour.  (*Id*.)  Therapy notes from January 16, 2019 indicated that she continued to exhibit difficulty with normal gait, hip abduction, extension weakness, and core activation after five therapy sessions.  (Tr. 628.)

Ms. Iacoboni saw Dr. Rosenquist again on January 22, 2019, when she reported some improvement from therapy and the TENS unit, but no benefit from ibuprofen or Salon Pas patches.  (Tr. 625-26.)  Dr. Rosenquist ordered x-rays of her lumbar spine and advised her to continue therapy, home exercises, use of the TENS unit and all medications.  (Tr. 626.)

On January 31, 2019, Ms. Iacoboni saw Abby Abelson, M.D., for an evaluation of osteopenia.  (Tr. 607.)  She reported chronic low back pain that was worse with walking, and said she required use of a wheelchair in large stores.  (*Id*.)  Dr. Abelson diagnosed osteopenia, and advised supplementation of calcium and vitamin D.  (Tr. 607-08.)

Ms. Iacoboni returned to Dr. Rosenquist on February 19, 2019.  (Tr. 596.)  She reported no change in pain or function (Tr. 597), although taking ibuprofen twice instead of once a day was helpful and her pain was well controlled unless she increased her activity (Tr. 599).  Dr. Rosenquist recommended continuing therapy, home exercise, use of her TENS unit, and nerve blocks. (Tr. 600.)  On March 11, 2019, Dr. Rosenquist performed lumbar medial branch nerve blocks.  (Tr. 587-88.)

At her next appointment on March 21, 2019, Ms. Iacoboni reported moderate improvement in pain and function.  (Tr. 582.)  On examination, her motor strength was grossly normal and gait was normal.  (Tr. 585.)  Dr. Rosenquist noted the nerve blocks had not been beneficial, and Ms. Iacoboni was not a candidate for radiofrequency ablation.  (*Id*.)  She advised Ms. Iacoboni to continue therapy and home exercises, use her TENS unit, and take medications as prescribed, and opined that further intervention was not warranted at that time.  (*Id*.)

Pain management specialist Chong Kim, M.D., evaluated Ms. Iacoboni on April 29, 2019.  (Tr. 727.)  She reported years of back pain and more recent right leg pain.  (*Id*.)  Dr. Kim noted limited neck and lumbar range of motion, but otherwise intact range of motion, full strength, and normal gait.  (Tr. 730.)  Dr. Kim ordered an MRI of the lumbar spine.  (*Id*.)

On April 25, 2019, Ms. Iacoboni returned to Dr. Moore and reported that neither of her surgeries had helped her significantly.  (Tr. 731.)  She complained that her hands bothered her and she was unable to knit.  (*Id*.)  Examination and imaging confirmed the fusion was well healed.  (*Id*.)  Dr. Moore advised there was nothing more he could do surgically, and suggested she consult with neurology and maybe have an EMG ordered.  (*Id*.)

On May 20, 2019, Ms. Iacoboni returned to Dr. Kim and reported ongoing pain, particularly on the right side the back and leg.  (Tr. 749.)  On examination, Ms. Iacoboni's gait was normal and her strength was intact; however, she had limited range of motion in her neck and low back.  (Tr. 752.)  An MRI taken that month showed mild degenerative changes of the lumbar spine, including a diffuse disc bulge at both L3-L4 and L4-L5, causing mild narrowing of the canal and bilateral neural foramina.  (Tr. 755-56.)  Dr. Kim reviewed the MRI and advised Ms. Iacoboni to continue activity as tolerated, including aqua therapy.  (Tr. 752.)

2. **Opinion Evidence**

i. **Consultative Examination**

On September 26, 2019, a month after the established disability onset date, Ms. Iacoboni was examined by consultative examiner Dariush Saghafi, M.D.  (Tr. 804-07.)  She reported neck pain over the past six or seven years, which she tried to treat with a TENS unit, heating pad, massage, and medication.  (Tr. 804.)  She complained that her pain worsened with any activity involving the neck, and that standing for more than five or ten minutes initiated pain.  (*Id*.)  She

8

reported that she could walk for five minutes before having to take a break, used a wheelchair when shopping in a store, and tried not to lift anything heavier than a gallon of milk.  (*Id*.)  On examination, Ms. Iacoboni's muscle tone and bulk were normal for her age, with full strength and range of motion in her extremities, no tenderness over her spine, and normal gait.  (Tr. 805-06, 808-10.)  She had a normal range of motion in her dorsolumbar spine, but was slightly limited by pain in cervical extension and rotation.  (Tr. 809-810.)  Dr. Saghafi opined that the mild to moderate limitation in her cervical range of motion was due to chronic pain caused by her past cervical laminectomy procedures.  (Tr. 806.)  He also opined that she could lift up to ten pounds, and could bend, walk, or stand for five to ten minutes before having to take a break.  (*Id*.)  The standing, walking, and lifting limitations described by Dr. Saghafi closely corresponded with Ms. Iacoboni's self-reported limitations, as reflected in the patient history section of the report.  (Tr. 804.)

### ii.    Functional Capacity Evaluation

Nine months after the established onset date, on April 23, 2020, a functional capacity evaluation was performed by Edward Aube, PT, DPT, of Rehab Professional of Cleveland, Inc., to assess Ms. Iacoboni's ability to continue work as a child care center administrator.  (Tr. 899-905.)  PT Aube noted Ms. Iacoboni was unable to sit for thirty minutes during the paperwork and intake process and was able to stand for less than thirty minutes at a time during the functional capacity evaluation.  (Tr. 902-03.)  He opined that she demonstrated the physical ability to perform sedentary activities for short periods of time, but was limited by spinal pain, upper extremity strength impairments, and spinal mobility impairments.  (Tr. 905.)  She could lift no more than ten pounds to chest height, and frequently lift and carry only five pounds.  (*Id*.)  She could never operate foot controls, reach above her shoulder, kneel, squat, or climb.  (*Id*.)  She

had low finger and manual dexterity, low keyboarding speed, low ambulation stamina, and would occasionally need a one-handed work option.  (*Id.*)  He recommended she be designated totally disabled from all employment or work at home.  (*Id.*)

### iii.    State Agency Reviewers

On June 3, 2019, state agency reviewing physician Yeshwanth Bekal, M.D., reviewed the record and opined that Ms. Iacoboni had the following physical functional limitations:

- lifting, carrying, and pulling twenty pounds occasionally and ten pounds frequently;

- standing/walking for no more six hours out of an eight-hour workday;

- sitting for six hours out of an eight-hour workday;

- frequently climb ramps and stairs, balance, stoop, kneel and crouch;

- frequently reach overhead, finger, and handle bilaterally;

- occasionally crawl;

- never climb ladders, ropes, or scaffolds; and

- avoid all exposure to hazards including unprotected heights and truck driving.

(Tr. 72-74.)

On October 8, 2019, state agency reviewing physician Abraham Mikalov, M.D., reviewed the record and concurred with Dr. Bekal's opinion except he did not find any limitations on Ms. Iacoboni's ability to handle or finger.  (Tr. 87-89.)

## C.    Hearing Testimony

### 1.    Plaintiff's Testimony

At her June 23, 2020 hearing, Ms. Iacoboni testified that she previously provided care for infants and children in her home.  (Tr. 42-43.)  She cared for children up to preschool age, and sometimes elementary age children during school breaks.  (*Id.*)  She said she was no longer able

to do that work because she did not have the strength to lift the children, weakness and numbness in her hands made it hard to grip, any type of reaching was painful, and she could not stand for long periods of time.  (Tr. 43.)

With regard to her physical functional capacity, she testified she could stand maybe five minutes a time.  (Tr. 45.)  Standing longer caused severe lower back pain.  (*Id*.)  She could sit for twenty minutes to an hour before she needed to change position due to back pain.  (Tr. 46.) Walking any distance at all made the pain much worse, so she started using a wheelchair.  (*Id*.)

She testified that her sleep was limited because she had to change positions frequently during the night.  (Tr. 43.)  She used heating pad to eliminate some of the pain.  (Tr. 44.)  She also had a TENS unit, which used to relieve her pain but was no longer effective.  (*Id*.)  She had tried injections, but they did not help her pain.  (Tr. 45).

### 2.     Vocational Expert's Testimony

A Vocational Expert ("VE") testified that a hypothetical individual of Ms. Iacoboni's age, education, and work experience, and with the functional limitations described in the ALJ's first RFC determination could perform Ms. Iacoboni's past work as a daycare worker as generally performed, but not as actually performed; there were no transferrable skills to the sedentary level.  (Tr. 53-54.)  The relevant limitations included: light work; frequently climbing ramps or stairs; never climbing ladders, ropes, or scaffolds; frequently balancing, stooping, kneeling, or crouching; occasionally crawling; frequent overhead reaching with both upper extremities; avoid all exposure to unprotected heights; and no commercial driving.  (Tr. 53.)  The VE testified that Ms. Iacoboni's past work would be eliminated if the hypothetical were modified to permit only occasional stooping.  (Tr. 59.)

11

### III.     Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.     If the claimant is doing substantial gainful activity, he is not disabled.

2.     If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.     If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.     If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.     If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520;[1] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Under this

sequential analysis, the claimant has the burden of proof at Steps One through Four.  *See Walters*

*v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the Residual Functional

Capacity ("RFC") and vocational factors to perform other work available in the national

economy.  *Id.*

## IV.    The ALJ's Decision

In his July 28, 2020 decision, the ALJ made the following findings:[2]

1.    The claimant meets the insured status requirements of the Social Security
      Act through December 31, 2021.  (Tr. 15.)

2.    The claimant has not engaged in substantial gainful activity since January
      1, 2017, the alleged onset date.  (*Id.*)

3.    The claimant has the following severe impairment: degenerative disc
      disease (cervical and lumbar).  (*Id.*)

4.    The claimant does not have an impairment or combination of impairments
      that meets or medically equals the severity of the listed impairments in 20
      C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 18.)

5.    From January 1, 2017 to August 28, 2019, the claimant had the residual
      functional capacity to perform light work as defined in 20 CFR
      404.1567(b) except frequent ramps and stairs; no ladders, ropes, or
      scaffolds; only *frequently stoop*, balance, kneel, crouch, and occasional
      crawl; limited to frequent overhead reaching with the upper extremities
      bilaterally; must avoid all exposure to unprotected heights, and cannot
      perform commercial driving.  (Tr. 18-19 (emphasis in original).)

6.    After August 29, 2019, the claimant had the residual functional capacity to
      perform light work as defined in 20 CFR 404.1567(b) except frequent

---

[1] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501, et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq*., corresponding to the last two digits of the DIB cite (*i.e.*, 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

[2] The ALJ's findings are summarized.

ramps and stairs; no ladders, ropes, or scaffolds; only frequent balance, kneel, or crouch, and *occasional stoop* or crawl; limited to frequent overhead reaching with the upper extremities bilaterally; must avoid all exposure to unprotected heights, and cannot perform commercial driving. (Tr. 24 (emphasis in original).)

7.     Prior to August 29, 2019, the claimant was able to perform past relevant work as a Daycare Worker.  (Tr. 26.)

8.     Beginning on August 29, 2019, the claimant's residual functional capacity prevented the claimant from being able to perform past relevant work.  (Tr. 27.)

9.     The claimant was an individual of advanced age on August 29, 2019, the established disability onset date.  (*Id*.)

10.     The claimant has at least a high school education.  (*Id*.)

11.     The claimant does not have work skills that are transferable to other occupations within the residual functional capacity defined above.  (*Id*.)

12.     Since August 29, 2019, considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant can perform.  (*Id*.)

Based on the foregoing, the ALJ determined that Plaintiff had not been under a disability prior to August 29, 2019, as defined in the Social Security Act, but became disabled on that date and had continued to be disabled through the date of the decision on July 28, 2020.  (*Id*.)

## V.     Plaintiff's Arguments

Ms. Iacoboni's sole assignment of error is that the ALJ's finding that she could perform light work was not supported by substantial evidence.  (ECF Doc. 10 p. 10.)

## VI.     Law & Analysis

### A.     Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives

15

the claimant of a substantial right.'"  *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651

(6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing

*Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))).  A decision will also not

be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge

between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio

2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.  Sole Assignment of Error: Whether ALJ's Determination That Ms. Iaconi Could Perform Light Work Was Supported by Substantial Evidence**

Ms. Iaconi argues the ALJ's finding that she is capable of light work is not supported

by substantial evidence because he failed to properly evaluate the opinion of consultative

examiner Dr. Saghafi.  (ECF Doc. 10, pp. 1, 10-13.)  Specifically, she argues the ALJ failed to

sufficiently articulate his basis for finding the opinion unpersuasive, providing only one reason to

support his finding.  (*Id*. at p. 11.)  The Commissioner responds that the ALJ's decision as a

whole makes it clear that he appropriately considered the objective medical evidence, prior

administrative medical findings, medical opinion evidence, and other medical evidence in

support of the weight he gave to Dr. Saghafi's opinion.  (ECF Doc. 12, p. 6.)

The Social Security Administration's ("SSA") regulations for evaluating medical opinion

evidence require ALJs to evaluate the "persuasiveness" of medical opinions "using the factors

listed in paragraphs (c)(1) through (c)(5)" of the regulation.  20 C.F.R. § 404.1520c(a); *see Jones*

*v. Comm'r of Soc. Sec.*, No. 3:19-CV-01102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020).

The five factors for consideration are supportability, consistency, relationship with the claimant,

specialization, and other factors.  20 C.F.R. § 404.1520c(c)(1)-(5).  The two most important

factors are supportability and consistency.  20 C.F.R. §§ 404.1520c(a), 404.1520c(b)(2).

An ALJ must explain how he considered the factors "supportability" and "consistency," but need not explain how he considered the other factors.  *See* 20 C.F.R. § 404.1520c(b)(2); *see Cormany v. Kijakazi*, No. 5:21CV933, 2022 WL 4115232, at *3 (N.D. Ohio Sept. 9, 2022).  He must sufficiently articulate the analysis so that a reviewing court can follow his reasoning.  *See Cormany*, 2022 WL 4115232, at *3 (citations omitted).  However, "an ALJ need not specifically use the terms 'supportability' or 'consistency' in his analysis."  *Id.* (collecting cases); *see also Anteer v. Kijakazi*, No. 3:20-CV-00952, 2021 WL 4424475, at *16 (N.D. Ohio Sept. 27, 2021).

In assessing supportability, "the focus is on the relevance of the objective medical evidence and supporting explanations upon which the opinion is based." *Cormany*, 2022 WL 4115232, at *5 (citation and internal quotation marks omitted).  "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinions . . . will be."  20 C.F.R. § 404.1520c(c)(1).

In contrast, "[c]onsistency denotes the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." *Cormany*, 2022 WL 4115232, at *6 (citation and internal quotation marks omitted).   "The more consistent a medical opinion[] . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[] . . . will be."  20 C.F.R. § 404.1520c(c)(2).

Dr. Saghafi conducted a consultative examination of Ms. Iacoboni at the request of the Ohio Rehabilitation Services Commission Bureau of Disability Determination.  (Tr. 804-07.)  The ALJ explained his analysis of Dr. Saghafi's opinion as follows:

> The claimant underwent an internal medicine consultative examination with Dariush Saghafi, MD on September 26, 2019. She reported neck pain, that she could walk no more than five minutes without a break, that she required use of a wheelchair when shopping in a store, and that she could lift no more than a gallon

17

of milk. Upon examination, she exhibited intact strength and sensation in her upper and lower extremities bilaterally, as well as a normal gait and lumbar range of motion. However, she had limited and painful cervical spine range of motion. She was assessed with status post cervical laminectomies with associated chronic pain. Based on the evaluation, Dr. Saghafi outlined that the claimant was limited to lift, push, and pull to lift up to 10 pounds. She was able to bend, walk, and stand for up to five to 10 minutes without having to take a break. She could understand the environment and her peers, and could communicate satisfactorily. She could also travel independently.

\* \* \* \*

The undersigned finds the assessment of Dr. Saghafi to be unpersuasive as the level of limitation alleged is not supported by evidence of intact strength in her upper extremities and a normal gait during his evaluation. Additionally, the undersigned notes that a finding on an issue reserved to the Commissioner, such as the ability to perform work, is not inherently valuable or persuasive.

(Tr. 24, 26 (emphasis added) (citations omitted).)

Ms. Iacoboni argues that the ALJ did not sufficiently articulate his basis for finding the opinion unpersuasive because he only gave one reason in support – that the stated level of limitation was "not supported by evidence of intact strength in her upper extremities and a normal gait." (ECF Doc. 10, p. 11 (quoting Tr. 26).) Ms. Iacoboni contends that the ALJ's finding was in error because Dr. Saghafi's opinion is consistent with the objective evidence of record. (*Id.* at p. 11.) In support, she describes specific imagery, objective findings, surgeries, treatment modalities, and subjective complaints noted in the medical records, and argues the Court "should find that substantial evidence unites to support the opinion of Dr. Saghafi." (*Id.* at pp. 12-13.) She acknowledges in her discussion, however, that the ALJ explicitly discussed the very same findings in his decision. (*Id.* (citing Tr. 19-22).)

To articulate a decision supported by substantial evidence, an ALJ is not "required to discuss each piece of data in [his] opinion, so long as [he] consider[s] the evidence as a whole and reach[es] a reasoned conclusion." *Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th

Cir. 2006) (per curiam)).  He may also rely on information articulated earlier in the decision to support his persuasiveness determination, and is not required to rearticulate that information in the opinion discussion.  *See Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) ("No doubt, the ALJ did not reproduce the list of these treatment records a second time when she explained why Dr. Bell's opinion was inconsistent with this record. But it suffices that she listed them elsewhere in her opinion.") (citing *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014)); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006) (finding no need to require the ALJ to "spell out every fact a second time").

Here, the ALJ found Dr. Saghafi's opinion unpersuasive because a limitation to lifting no more than ten pounds and/or standing or walking no more than five to ten minutes is "not supported by evidence of intact strength in her upper extremities and a normal gait."  (Tr. 26.) This is an accurate characterization of Dr. Saghafi's exam findings (relevant to supportability), which were unremarkable except for a "mild to moderate limitation" in cervical range of motion. (Tr. 805-06, 808-10.)  It is also an accurate characterization of the examination findings of other providers in the record (relevant to consistency), who noted intact extremity strength and normal gait.  (*See, e.g.,* Tr. 20 (citing Tr. 353 (5/5 strength), 354 (same), 396 (same)), Tr. 21 (citing Tr. 302-03 (5/5 strength), 347-51 (normal strength)), Tr. 22 (citing Tr. 582-85 (grossly normal strength, normal gait), 643-47 (5/5 strength, normal gait), 727-30 (same), 790-94 (same)).)

The ALJ's analysis of Ms. Iacoboni's subjective complaints, noting the lack of consistent objective findings to support her asserted level of limitation, further elucidates his reasoning:

> [T]he level of limitation alleged are [*sic*] not altogether supported by the objective findings.  However, findings of gait abnormalities are not consistent in the record, and evidence contains findings of intact strength in her upper and lower extremities. The claimant's reflexes were intact and symmetric, and treatment notes contain evidence of intact sensation.

(Tr. 23 (citations omitted).)  His analysis of the state agency medical consultant opinions is also

instructive.  Both medical sources opined that Ms. Iacoboni could perform light work.  The ALJ

found their overall assessments to be persuasive prior to the established onset date because they

were consistent with and supported by the following evidence, which he described as follows:

> Specifically, the limitations included are supported by evidence of
> degeneration in her cervical and lumbar spine, decreased lumbar and cervical
> range of motion, decreased upper extremity strength, sensory and gait
> abnormalities, and decreased shoulder range of motion. However, a greater
> level of limitation, as alleged, is inconsistent with evidence that showed full
> strength in her upper and lower extremities, intact sensation, normal and
> symmetric reflexes, and a normal gait.

(*Id.* (citations omitted).)  It is evident from a review of the ALJ decision as a whole that the ALJ

gave adequate consideration to supportability and consistency in weighing the opinion evidence.

The Court also notes that Dr. Saghafi performed his consultative examination after the

established disability onset date of August 29, 2019.  (Tr. 804.)  Indeed, his findings were

considered by the ALJ in adopting the additional limitation to occasional stooping that precluded

Ms. Iacoboni from performing her past relevant work, rendering her disabled under the Medical-

Vocational Guidelines on her fifty-fifth birthday.  (Tr. 24-27.)  Thus, even if the ALJ had found

the opinion persuasive on the date it was rendered, it would not automatically follow that the

stated limitations would have been appropriate on the alleged onset date of January 1, 2017.

Ms. Iacoboni argues that "[t]he evidence discussed by the ALJ and upon which the ALJ

relies supports Dr. Saghafi's opinion that Plaintiff is limited to sedentary work," and asks this

Court to conclude "that substantial evidence unites to support the opinion of Dr. Saghafi."  (ECF

Doc. 10, pp. 12-13.)  This argument mistakes the applicable legal standard.  "'The substantial-

evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers

can go either way, without interference by the courts.'"  *Blakley*, 581 F.3d at 406.  Because it is

not a reviewing court's role to "try the case *de novo*, nor resolve conflicts in evidence," *Garner*,

745 F.2d at 387, this Court cannot overturn the Commissioner's decision "so long as substantial evidence . . . supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.  Thus, the question is not whether substantial evidence supports Ms. Iacoboni's reading of the evidence. Rather, the question is whether Ms. Iacoboni has met her burden to demonstrate that the ALJ's contrary reading of the evidence was <u>not</u> supported by substantial evidence.

Considering the totality of the record and the reasons articulated throughout the ALJ's decision, the Court finds the ALJ properly considered the supportability and consistency of Dr. Saghafi's opinion and explained his decision sufficiently to allow this Court to conduct a meaningful review of that determination.  Ms. Iacoboni has not met her burden to show that the ALJ's findings were not supported by substantial evidence.  Accordingly, the Court concludes that Ms. Iacoboni's sole assignment of error is without merit.

## VII.    Conclusion

For the foregoing reasons, the final decision of the Commissioner is **AFFIRMED**.


March 21, 2023                                   */s/Amanda M. Knapp*
                                                AMANDA M. KNAPP
                                                United States Magistrate Judge

21